UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL ENCARNACION,

               Petitioner,

    – *against* –

THE SUPERINTENDENT OF COLLINS
C.F.,

               Respondent.

**OPINION & ORDER**

21-cv-07584 (ER)

RAMOS, D.J.:

Samuel Encarnacion, proceeding *pro se*, filed a petition for a writ of habeas corpus ("Petition") pursuant to 28 U.S.C. § 2254 on September 9, 2021. Doc. 1. This Court referred the Petition to Magistrate Judge Stewart D. Aaron on January 25, 2022. Doc. 10.

Judge Aaron issued a Report and Recommendation ("R&R") on July 10, 2023, recommending that the Petition be denied in its entirety. Doc. 52. Two weeks later, on July 24, 2023, Encarnacion filed written objections to the R&R, and on August 23, 2023, the Superintendent of Collins C.F. (the "Superintendent") filed an opposition to the objections. Docs. 56, 63. For the reasons set forth below, the Court adopts the R&R in its entirety, and the Petition is DENIED.

## I.    BACKGROUND

The factual background and procedural history relevant to the Petition are set forth in detail in the R&R, familiarity with which is assumed. *See* Doc. 52. The Court sets forth below the facts necessary to resolve the objections.

### A.  The Arrest, Questioning, and Police Search

In response to a 911 call, police officers ("Officers") Kevin Brosnan and Norbert Mercado, and Emergency Medical Technicians ("EMTs"), including Scott Hernandez,

arrived at 1235 Harrod Avenue, Bronx, New York on January 20, 2005. Doc. 52 at 3.[1] Encarnacion met Officers Brosnan and Mercado and the EMTs in the lobby and told them that while he was out getting food, someone had stabbed his girlfriend, Ophelia Torres,[2] and her cousin, Johnny Torres. *Id.* Encarnacion further stated that he had been told by Ophelia that they had been stabbed by "some black guy." *Id.* Encarnacion then led the Officers and EMTs to Apartment 8J. *Id.* In Apartment 8J, the Officers and EMTs found both Ophelia and Johnny lying on the floor severely injured by multiple stab wounds. *Id.* at 3–4. Johnny was declared dead at the scene. *Id.* at 4; *see also* Doc. 43-7 at 115 (Detective Jack Peters Testimony).

Ophelia was transported to Jacobi Medical Center and examined by Dr. Sheldon Teperman, who was the Director of the Department of Surgery Trauma and Critical Care Services. *Id.* at 5. While being examined by Dr. Teperman, Ophelia identified Encarnacion as her attacker. *Id.*

Johnny's body was transported to the Office of the Chief Medical Examiner ("OCME") where Dr. Michele Slone, a forensic pathologist, performed an autopsy. Doc. 43-9 at 53–54, 56 (Dr. Slone's testimony); *see* Doc. 52 at 5 & n.15. The autopsy identified Johnny's cause of death as stab wounds to his neck and torso. Doc. 52 at 5.

The police discovered a garbage bag containing a pair of sweatpants, a white t-shirt, a pair of jeans, a pair of sneakers, and knives—all stained with blood—in the compactor room of the apartment complex. *Id.* at 4. The bloody clothing and knives were tested for DNA, yielding DNA profiles matching Encarnacion, Johnny, and an unidentified female. *Id.* at 4–5.

---

[1] Detective Jack Peters, Detective Lawrence Walsh, and Officer Stephen Kayser also responded to the scene. Doc. 52 at 4 ns. 8–11.

[2] The state court transcripts and other relevant exhibits use both Ophelia and Ofelia. The Court will use Ophelia to be consistent with the R&R.

The police interviewed Encarnacion at a police service area ("PSA").  Doc. 43-7 at 115.[3]  During the interview, the police informed Encarnacion that Ophelia was still alive, and he thereafter broke down and gave a different account of what happened that night.  *Id.* at 120; Doc. 52 at 5.  Detective Peters advised Encarnacion that it would be in "his best interest to write down the events as they happened," which he subsequently did.  Doc. 43-7 at 120.

In that written statement, Encarnacion stated that on January 20, 2025, he arrived at his apartment, Apartment 8J, to find Ophelia and Johnny already there.  *Id.* at 124.  Encarnacion started playing with Ophelia's dog, and Ophelia became upset, telling him not to play with the dog because she was trying to train it.  *Id.*  Ophelia then told Encarnacion that he was "no good" because he had not left her any money to buy food.  *Id.*  Similarly, Johnny stated that Encarnacion was "no good" and that Ophelia should "leave" Encarnacion.  *Id.*  As a result, Johnny and Encarnacion got into a verbal altercation, provoking Johnny to hit Encarnacion.  *Id.*  The altercation continued in the kitchen, where a physical fight ensued among Encarnacion, Johnny, and Ophelia.  *Id.* at 124–25.  During the altercation, Encarnacion "blacked out," causing him to forget how he got a hold of the knife, and only recalling that he "lost [his] sense and everything happened."  *Id.* at 125.  Encarnacion thereafter noticed that both Johnny and Ophelia were on the floor.  *Id.*  Encarnacion was "scared," so he went to a neighbor's apartment and asked the neighbor to call an ambulance.  *Id.*  He then took off his pants and put "everything" in a bag, including the knife, which he threw in the garbage.  *Id.*

After he finished and signed his written statement, Encarnacion wrote Ophelia a letter to apologize and ask for forgiveness.  *Id.* at 125–27.  Encarnacion also gave a video statement.  Doc. 43-8 at 150 (Detective Martin's testimony).

---

[3] The R&R and relevant testimony does not specify when specifically Encarnacion was taken to the PSA.  *See* Doc. 52.

A week later, on January 28, 2005, Ophelia testified in front of a grand jury about the events of January 20, 2005. Doc. 43-10 at 39–54 (Assistant District Attorney ("ADA") Sara Schall's testimony). Ophelia testified that when Encarnacion arrived at Apartment 8J, both she and Johnny were present. *Id.* at 44. At some point that night, Encarnacion and Ophelia went into a bedroom, where she told him that she wanted to end their relationship. *Id.* at 42–43. In response, Encarnacion became upset, went to the kitchen, and grabbed a knife. *Id.* at 45. Encarnacion then attacked Ophelia, stabbing her over 20 times on her chest, her back, and one of her fingers, while telling her that "[if he] can't have [her], nobody can . . . ." *Id.* at 45, 48. When Johnny intervened, Encarnacion stabbed him to death. *Id.* at 46. Encarnacion, acknowledging that he had killed Johnny, stated, "Johnny's dead. Look what I did. How am I going to get away with this . . . ." *Id.* at 46–47. Encarnacion then stabbed Ophelia once more, carried her to the living room, and told her he was going to let her die. *Id.* at 47. However, Encarnacion changed his mind, went to a neighbor's apartment, and called an ambulance. *Id.*

A week later, on February 4, 2005, Encarnacion was charged with murder in the second degree, attempted murder in the second degree, manslaughter in the first degree, manslaughter in the second degree, and two counts of assault in the second degree. Doc. 17-1.

**B.  New York Criminal Procedure Law Article 730 Examination**

A few weeks after the indictment, on March 14, 2005, Dr. Melissa Kaye, a psychiatrist at Bellevue Hospital's Division of Forensic Psychiatry, evaluated Encarnacion pursuant to New York Criminal Procedure Law ("CPL") § 730.30. Doc. 42-40 at 8–14.[4] Dr. Kaye concluded that Encarnacion "was invested in portraying himself as impaired," and that he feigned mental illness. *Id.* at 9–10.

---

[4] Section 730.30(1) provides that "[a]t any time after a defendant is arraigned upon an accusatory instrument other than a felony complaint and before the imposition of sentence … the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person."

### C.  Pretrial Proceedings

A few weeks prior to the start of trial, on September 18 and 19, 2007, Justice Elizabeth Ann Foley in Bronx County Supreme Court ("Bronx Supreme Court") held a hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (1965).  Doc. 43-1 (*Huntley* hearing transcript); *see* Doc. 52 at 7.[5]  During the hearing, Detective Peters testified that he read Encarnacion his *Miranda* rights and took his written statement.  Doc. 43-1 at 28, 34, 36.  Detective Peters further testified that during the interview, Encarnacion verbally described the stabbing and subsequently wrote the description in a written statement.  *Id.* at 30, 36.  The video statement was taken three-and-a-half hours after the initial written statement.  *Id.* at 19–22.

Justice Foley held that all of Encarnacion's statements were made voluntarily after waiving his *Miranda* rights.  Doc. 52 at 8; *see also* Doc. 42-40 at 45–46.  Accordingly, Justice Foley allowed both the written and video statements to be admitted.

### D.  Trial

Justice Foley presided over the trial, which began on November 8, 2007.  Doc. 43-6 at 104.

#### 1.  Sirois Hearing

On the same day that the trial started, Justice Foley held a *Sirois* hearing[6] because Ophelia refused to testify at trial and the government wanted to introduce her grand jury testimony into evidence.  Doc. 52 at 8.  In support of their application, the government

---

[5] A pretrial hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (1965), is held to determine the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers.  *See id.* at 77–78.

[6] "A *Sirois* hearing is a type of evidentiary hearing held during New York state criminal proceedings to determine whether the accused procured a witness' unavailability—either literal unavailability or refusal to testify—through misconduct."  *Drummond v. Cunningham*, No. 08-cv-04290 (KAM) (RLM), 2010 WL 5583116, at *2 n.5 (E.D.N.Y. Dec. 13, 2010), *report and recommendation adopted*, 2011 WL 132379 (E.D.N.Y. Jan. 17, 2011) ("A finding of such misconduct precludes the accused from objecting, on hearsay or Confrontation Clause grounds, to the admission of the witness' out-of-court statements.") (citations omitted); *see Holtzman v. Hellenbrand*, 460 N.Y.S.2d 591 (2d Dep't 1983).

called Ophelia's mother, Nancy Torres, and Detective Martin. *See* Doc. 43-7 at 43–94 (Nancy Torres' testimony); Doc. 43-8 at 31–38 (Detective Martin's testimony).

Torres testified that despite her repeated attempts to convince Ophelia to meet with ADA Suzanne McElwreath, and, even after Ophelia met with ADA McElwreath, Ophelia insisted that she would not testify. Doc. 43-7 at 46, 52, 54. Although Ophelia never told Torres that she did not want to testify because she was afraid of Encarnacion, Torres believed that Encarnacion's threat that his friends would "get her" if she did not "talk" and "cooperate" with him, or if she testified, were the reasons for Ophelia's refusal to testify. *Id.* at 52–53, 88–90.

Torres further testified that after the incident, Encarnacion repeatedly called her house for many months, and she reminded him each time that he called that that there was an order of protection that prohibited him from communicating with Ophelia. *Id.* at 60–62. Torres also testified that she overheard Ophelia say that Encarnacion would get "time served" if she repeated what Encarnacion told her to say, specifically that Johnny was the one who stabbed her. *Id.* at 62, 65–66. Shortly after, Ophelia began to claim that Johnny had stabbed her. *Id.* at 63, 65. In response, Torres admitted Ophelia into a psychiatric hospital for approximately five days. *Id.* at 65–66, 68, 82–85. Following her stay, Ophelia admitted that she only claimed that Johnny had stabbed her so Encarnacion could be released from jail sooner. *Id.* at 65–66.

After Torres' testimony, Detective Martin testified that at ADA McElwreath's request, he called Ophelia and asked her to come down to the District Attorney's office, but that Ophelia refused his request and told him that "[she] still loved [Encarnacion] and she's not coming." Doc. 43-8 at 32–33. Detective Martin further testified that Ophelia refused to tell him her location or allow him to bring her to the District Attorney's office. *Id.* at 36.

Finding that the government had met their burden in establishing by clear and convincing evidence that Ophelia's refusal to testify at trial was induced by

Encarnacion's misconduct, Justice Foley allowed the admission of Ophelia's grand jury testimony.  Doc. 42-40 at 43–44.  Ophelia's grand jury testimony was read to the jury by ADA Sara Schall at the conclusion of the government's case.  Doc. 43-10 at 39–54; *see* Doc. 52 at 10.

### 2. DNA Evidence

The DNA reports upon which the government relied were not themselves offered as evidence during the trial.  Doc. 52 at 11.  Rather, Daneille Coye, who worked in the DNA laboratory of the OCME, provided expert testimony as an expert in forensic biology.  *Id.* at 5 n. 13, 11; *see* Doc. 43-9 at 75–81 (Coye's testimony).  Coye testified regarding the DNA testing that she herself conducted, without objection, and that the DNA collected belonged to Encarnacion, Johnny, and an unknown female.  Doc. 52 at 11; Doc. 43-9 at 85–86, 92, 125–28.

However, Encarnacion's counsel objected when Coye testified regarding DNA testing that she had not conducted herself, arguing that Coye could not identify the precise location of the DNA samples collected from the jeans found in the trash compactor.  Doc. 43-9 at 102.  However, that objection was overruled.  *Id.*

### 3. Hearsay Objection to the Admission of Dr. Teperman's Testimony

During the trial, Encarnacion's counsel objected on hearsay grounds to the admission of Dr. Teperman's testimony about Ophelia's statement during her medical examination identifying Encarnacion as her attacker.  Doc. 43-7 at 98–102; Doc. 43-9 at 137–39.  The government argued that the testimony should be admitted under the hearsay exception as an excited utterance, highlighting that Ophelia was stabbed at least 20 times and bleeding profusely when she made the statement.  Doc. 43-9 at 139.  The government also argued that Ophelia did not have time make up a false statement, given that she made the statement shortly after she had been stabbed.  *Id.* at 140–41.

Justice Foley admitted Ophelia's statement under the excited utterance exception, finding that Ophelia was "under the influence of a startling event and she lacked the

ability for fabrication," which rendered "the statement [] spontaneous and trustworthy." *Id.* at 144–45.

After the government rested its case, Encarnacion rested his case without calling any witnesses. Doc. 43-10 at 56.

### 4. *Jury Charge*

Before the conclusion of the trial, and in response to Ophelia's grand jury testimony, Encarnacion's counsel requested that the court charge the defense of extreme emotional disturbance ("EED"). Doc. 43-10 at 32.[7] Encarnacion's counsel argued that "Ophelia['s] . . . [g]rand [j]ury testimony indicates that [Encarnacion] went berserk," and that had he known about the substance of her testimony ahead of time, he would have asserted a defense of EED. *Id.* He further stated that he did not "know of the existence of these [sic] set of facts prior" to that day. *Id.* Justice Foley stated that she would "think about it" but that her "initial inclination [was] to deny the request." *Id.* at 32–33. Ultimately, she did not read the EED instruction to the jury. Doc. 52 at 12. Before she read the jury charge, Justice Foley asked Encarnacion's counsel if he had reviewed the draft charge, to which he responded in the affirmative, neither raising any objection to the proposed charge nor renewing his request for an EED charge. Doc. 43-10 at 90. Justice Foley then instructed the jury on the applicable law, which did not include an EED instruction. *Id.* at 91–140.

### 5. *Jury Verdict*

The jury returned a guilty verdict, convicting Encarnacion of one count of second-degree murder, one count of attempted second-degree murder, and two counts of first-degree assault. Doc. 52 at 12.

---

[7] The affirmative defense of extreme emotional disturbance allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although not free from responsibility for the crime, defendant ought to be punished less severely. *People v. Roche*, 98 N.Y.2d 70, 75 (2002) (citing McKinney's Penal Law §§ 125.20, subd. 2, 125.25.).

### E.  Sentencing

The sentencing hearing was held on December 19, 2007.  Doc. 43-11 at 9–26 (Sentencing transcript).  During the hearing, Encarnacion's counsel moved to set aside the verdict, which was denied.  *Id.* at 12.

Additionally, a victim statement from Torres was read at the hearing, and Ms. Noriega, Johnny's aunt, gave an in-person statement.  *Id.* at 13–21.

At the conclusion of the testimony, Justice Foley sentenced Encarnacion primarily to 20 years to life on the murder charge, to run consecutively with three concurrent 20-year prison terms on the remaining counts of conviction.  *Id.* at 24–25.

### F.  Appeals

#### *1.  Direct Appeal*

A week after his sentencing, on December 26, 2007, Encarnacion filed a notice of appeal.  Doc. 52 at 13.  A year and half later, on July 2, 2009, Encarnacion filed his appeal with the Appellate Division, First Department, New York (the "Appellate Division") challenging his conviction on four grounds:  (1) that the trial court's admission of Ophelia's grand jury testimony violated his Sixth Amendment right to confront the witnesses against him; (2) that the trial court erred in failing to include the EED jury instruction, and his counsel provided ineffective assistance of counsel by not objecting to that failure; (3) that the trial court erred in admitting DNA evidence without the testimony of the person who conducted the testing in violation of his Sixth Amendment right to confront the witnesses against him; and (4) that the trial court imposed an excessive sentence.  Doc. 17-2.

On June 23, 2011, the Appellate Division affirmed Encarnacion's conviction. *People v. Encarnacion*, 87 A.D.3d 81 (1st Dep't 2011).  As to the admission of Ophelia's grand jury testimony, the court explained that "[Ophelia's] refusal to testify was the product of fear, precipitated by [Encarnacion] . . . [and regardless,] even if it was error to admit [Ophelia's] grand jury testimony . . . given the overwhelming evidence of

[Encarnacion's] guilt . . . such error was nevertheless harmless." *Id.* at 88–89. As to the EED jury instruction, the court noted that "[i]nsofar as defense counsel never objected to the trial court's failure to submit this [EED] instruction to the jury, this issue was abandoned and unpreserved." *Id.* at 92. As to the DNA evidence, the court noted that "insofar as defense counsel never specifically objected to the DNA testimony on the grounds he now presses on appeal, namely that the testimony violated his right of confrontation, [Encarnacion] failed to preserve this issue for our review." *Id.* The court also rejected the merits of the arguments for the EED jury instruction and DNA evidence, including the ineffective assistance of counsel argument. *Id.* The court noted that "it cannot be determined on the existing record whether counsel's abandonment of the issue was an oversight or a deliberate strategic choice." *Id.* Lastly, as to the excessive sentence, the court held that it "perceive[d] no basis for reducing [Encarnacion's] sentence." *Id.* Following the decision, the New York Court of Appeals denied Encarnacion's application for leave to appeal on November 18, 2011. *People v. Encarnacion*, 959 N.E.2d 1027 (2011).

  *2. Writs of Coram Nobis*

  Encarnacion, now proceeding *pro se*, filed two motions for writ of error *coram nobis* on July 24, 2012, and May 22, 2017, respectively. Doc. 52 at 16, 21.

  In his first motion, filed on July 24, 2012, Encarnacion raised three grounds to vacate his judgment. Doc. 42-5 at 2–3. First, he argued that he was denied his right to effective assistance of counsel on appeal in violation of his state and federal constitutional rights. *Id.* at 2. Second, he argued that appellate counsel was ineffective for failing to raise the issue of Dr. Teperman's testimony, specifically that he suffered a violation of his right of confrontation. *Id.* Lastly, he argued that his appellate counsel was ineffective for failing to raise his right against self-incrimination, specifically the statements he made to Detective Peters; thus, these statements were obtained in violation of the Fifth Amendment. *Id.* at 3. The Appellate Division denied the motion on

December 27, 2012. *People v. Encarnacion*, Motion Decision M-4076, 2014 N.Y. Slip Op. 87039(U) (1st Dep't Dec. 27, 2012). Six months later, on May 31, 2013, the New York Court of Appeals denied leave to appeal. *People v. Encarnacion*, 990 N.E.2d 138 (2013).

In the second motion, filed on May 22, 2017, Encarnacion argued that his appellate counsel provided ineffective assistance of counsel when he failed to argue on direct appeal that the buccal swabs used to obtain his DNA sample were forcibly taken in violation of his Sixth Amendment right to counsel and due process, which in turn led to the denial of his Fourth Amendment right to be free from bodily intrusion. Doc. 42-18. Encarnacion later filed a supplemental affidavit, reiterating the same three claims he previously raised in his initial writ and arguing that he was the victim of an "elaborate plot" between "the [government], the judge, and counsel … to deprive [him] of his constitutional rights under the law and ambush him at trial with illegally obtained evidence." Doc. 17-19 at 5–6. Encarnacion also asserted in the supplemental affidavit that his trial counsel deprived him of effective representation when counsel did not "subject the [government's] case to any meaningful adv[ersarial] testing" and permitted a *Brady* violation to occur when he refrained from objecting to the testimony of the government's DNA expert. *Id.* at 18, 35.

On February 8, 2018, the Appellate Division denied the motion. *See People v. Encarnacion*, Motion Decision M-2958, 2018 N.Y. Slip Op 63479(U) (1st Dep't 2018). Four months later, on June 12, 2018, the New York Court of Appeals denied leave to appeal. *See People v. Encarnacion*, 106 N.E.3d 759 (2018).

3. *Section 440.10 and 440.20 motions*

Encarnacion, again proceeding *pro se*, filed various CPL § 440.10 motions to vacate his conviction, and CPL § 440.20 motions to vacate his sentence in the Bronx Country Supreme Court between October 2013 to August 2018. Doc. 52 at 17–25.

11

Encarnacion filed his first § 440.10 motion on October 7, 2013 ("October 2013 § 440.10 motion") based on five grounds. Doc. 42-7. First, Encarnacion argued that his trial counsel failed to adequately counsel him regarding the government's plea offer. *Id.* at 4–5, 11–12, 16, 18, 21. Second, he argued that his trial counsel failed to move for a mistrial after a DNA expert testified about the results of the DNA tests—which were not conducted until either the trial had already commenced, or immediately prior thereto and were not provided to his trial counsel—to provide extremely damaging testimony. *Id.* at 16. Third, he argued that his trial counsel provided an inadequate opening statement that "left much to be desired," a "brief and totally ineffective" cross-examination, and an inadequate closing argument. *Id.* at 12, 16, 18. Fourth, he argued that his trial counsel failed to request appropriate jury instructions regarding EED and; fifth, he argued that his trial counsel failed to "file motion papers that were sufficient to obtain a '*Dunaway*' hearing, which likely would have resulted in the suppression of his [inculpatory] statements" based upon "his unlawful detention." *Id.* at 16, 19.[8]

In support of the October 2013 § 440.10 motion, Encarnacion submitted an affirmation from his trial counsel, stating that, either shortly before trial or very early during trial, the government conveyed a plea offer with a ten-year sentence. *Id.* at 31. However, in that affirmation, his trial counsel also stated that he "discussed the matter with the defendant, who made a decision to reject the offer." *Id.* at 31–32. In opposition, the government submitted an affirmation from ADA McElwreath, who prosecuted the case against Encarnacion, stating that no plea offer of ten years was ever contemplated or made. Doc. 42-8. In addition, the government submitted evidence reflecting that, on February 9, 2006, they made a note on a "Plea Board" summary indicating that they were

---

[8] *Dunaway v. New York* addressed the "legality of custodial questioning on less than probable cause for a full-fledged arrest." 442 U.S. 200, 202 (1979) (citation omitted). Thus, a *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial. *Berry v. Hulihan*, No. 08-cv-6557 (LBS), 2009 WL 233981, at *7 (S.D.N.Y. Jan. 28, 2009) (citation omitted).

considering an offer of "20 to life," and that on June 8, 2006, they rejected Encarnacion's offer of "15 flat." *Id.*[9]

On December 23, 2013, the Bronx Supreme Court denied the October 2013 § 440.10 motion. Doc. 42-10. Specifically, the court noted that the first ground was "supported solely by" Encarnacion's own words and lacked credibility. *Id.* at 4. As to the second and third grounds, the court explained that he did not raise them on direct appeal and did not provide any justification for his failure to do so. *Id.* As to the fourth ground, the court noted that Encarnacion failed to "supplement the record" to discern whether his trial counsel deliberately abandoned the EED issue, or whether it was an oversight. *Id.* Finally, as to the fifth ground, the court explained that his legal papers did not "allege any ground" sufficient "to vacate the conviction." *Id.* at 5. Approximately ten months later, on October 21, 2014, the Appellate Division denied leave to appeal. *People v. Encarnacion*, Motion Decision M-4309, 2014 N.Y. Slip Op. 87039(U) (1st Dep't 2014).

After the Bronx Supreme Court had denied the October 2013 § 440.10 motion, but before the Appellate Division denied leave to appeal, Encarnacion alleges that on July 14, 2014, he mailed a § 440.20 motion to the Bronx Supreme Court to vacate his sentence. Doc. 52 at 20. However, the motion was never filed and thus never decided. *Id.*

Encarnacion filed a second § 440.10 motion on December 29, 2015 ("December 2015 § 440.10 motion"). Doc. 42-11. Encarnacion challenged the DNA buccal swab taken from him prior to trial because (1) the government's motion to acquire buccal swabs should have been denied because it was untimely and violated his constitutional rights to a fair trial and due process; (2) the government committed a *Brady* violation by failing to provide his DNA laboratory report to his counsel; and (3) his trial counsel was

---

[9] The affirmation does not explain what a "Plea Board" is. *See* Doc. 42-8.

ineffective for failing to challenge the government's undue delay in requesting a buccal swab and the alleged *Brady* violation. *Id.* at 10–18, 20–28, 28–38.

On November 28, 2016, the Bronx Supreme Court denied the December 2015 § 440.10 motion. Doc. 42-16. Specifically, the claims were denied pursuant to CPL § 440.10(2)(c) and CPL § 440.10(3)(c) because they were previously litigated "be it on direct appeal, his *coram nobis* application, or his prior CPL § 440.10 motion." *Id.* at 5. The court explained that "to the extent such claims are record-based, they could have and should have been raised on direct appeal" and "[t]o the extent they are not, they . . . should have been asserted in either of his subsequent post-appellate proceedings." *Id.* The court also denied the motion pursuant to CPL § 440.30(4)(d) for failing to allege sufficient issues of fact, because Encarnacion "neither provided an affidavit from trial counsel, nor specified or documented the efforts he made to do so." *Id.* at 7. The court denied the ineffective assistance of counsel claim because Encarnacion "failed to establish that given the totality of the circumstances, counsel's conduct was so egregious [that] it deprived him of a fair trial." *Id.* at 12. On March 15, 2017, the Appellate Division denied leave to appeal. *People v. Encarnacion,* Motion Decision M-303, 2017 N.Y. Slip Op 67205(U) (1st Dep't 2017).

Once again, on August 15, 2016, after the Bronx Supreme Court had denied the December 2015 § 440.10 motion, but before the Appellate Division denied leave to appeal, Encarnacion alleges that he mailed and filed a § 440.20 motion to the Bronx Supreme Court. Doc. 52 at 21. However, the motion was never received or filed, and thus, again, it was never decided. *Id.*

Encarnacion filed a § 440.20 motion on July 16, 2018 ("July 2018 § 440.20 motion"). Doc. 42-22. Encarnacion argued that the trial court incorrectly imposed consecutive sentences for the murder and attempted murder, but was not required to do so by Penal Law 70.25 to do so. *Id.* at 8. Encarnacion further argued that the trial court imposed this sentence despite the fact that the government "presented no evidence" that

14

his acts were "'separate and distinct[,]' warranting consecutive terms of imprisonment."

*Id.*

On February 5, 2019, the Bronx Supreme Court denied the July 2018 § 440.20

motion, finding:

> The *actus reus* of the murder of Johnny was stabbing him approximately sixteen times, and the *actus reus* of the attempted murder of and assaults on Ophelia was stabbing her over twenty times. Thus, the stabbing of Johnny and the stabbing of Ophelia, though part of the same overall transaction, were separate acts committed against separate victims for which consecutive sentences were appropriately imposed.

Doc. 42-24 at 3.

Following the denial, on June 6, 2019, the Appellate Division denied leave to

appeal. *People v. Encarnacion*, Motion Decision M-1486, 2019 NY Slip Op 72017(U)

(1st Dep't 2019).

Encarnacion placed a § 440.10 motion, dated August 29, 2018, into the Auburn

Correctional Facility prison mailbox on September 4, 2018 ("September 2018 § 440.10

motion"). Doc. 52 at 23; Doc. 42-25.[10] In his motion, Encarnacion provided three main

grounds to vacate his conviction. Doc. 42-25. First, Encarnacion argued that his rights to

due process and counsel were violated when the trial court granted the government's

motion to obtain his DNA sample without providing him with notice, an opportunity to

respond, or an opportunity to discuss the merits of the motion with trial counsel. *Id.* at

29, 32, 24, 60–62, 101, 104. Second, he argued that the government committed a *Brady*

violation by failing to provide the DNA laboratory report to his counsel. *Id.* at 87, 89–91.

And third, he argued that the government violated his Sixth Amendment right of

confrontation. *Id.* at 92.

---

[10] The R&R notes that Encarnacion filed an additional § 440.10 motion on December 17, 2018, where he requested that his motion be converted to a state habeas petition and raised the same DNA claims raised in his previous December 2015 § 440.10 motion. Doc. 52 at 23 n.25. However, the court denied the motion. *Id.*

On January 7, 2021, the Bronx Supreme Court denied the September 2018 § 440.10 motion. Doc. 42-34. As the Bronx Supreme Court put it, Encarnacion failed to raise most of his claims on appeal, despite the fact that his claims were "record-based." *Id.* at 3–4. The Bronx Supreme Court also noted that Encarnacion's arguments were "previously determined on the merits" in prior state proceedings. *Id.* at 4–5. On June 1, 2021, the Appellate Division denied leave to appeal. *See People v. Encarnacion*, Motion Decision 2021-00487, N.Y. Slip Op 67364(U) (1st Dep't 2021).

### 4.  State Habeas Petition

Encarnacion filed a state habeas corpus petition on June 4, 2019, which was denied on November 11, 2019. Doc. 7 at 141–42. The court denied the petition because "habeas corpus relief is unavailable in cases where an issue could have been raised on direct appeal or in the context of a CPL article 440 motion." *Id.* at 142.

Encarnacion filed the instant Petition on September 9, 2021. Doc. 1.

## II.    LEGAL STANDARD

### A.  AEDPA Review of the State Court Proceedings

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, habeas petitions under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). This deference is required under the AEDPA if the petitioner's claim "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Bell v. Miller*, 500 F.3d 149, 154–55 (2d Cir. 2007).

"Th[e] statutory phrase ['clearly established Federal law, as determined by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v.*

16

*Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to," or an "unreasonable application of," clearly established law if first, it is contrary to Supreme Court precedent on a question of law; second, arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts or; third, identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case.  *Id.* at 412–13.

In order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The factual findings made by state courts are presumed to be correct under the AEDPA, and petitioner has the burden to rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Nelson v. Walker,* 121 F.3d 828, 833 n.4 (2d Cir. 1997).

### B.  Review of Magistrate Judge's R&R

A district court reviewing a magistrate judge's R&R "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Parties may raise written objections to the R&R within fourteen days after being served with a copy.  *Id.*; Fed. R. Civ. P. 72(b)(2).  A district court reviews *de novo* those portions of the R&R to which timely and specific objections are made.  28 U.S.C. § 636(b)(1); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  The district court may adopt those parts of the R&R to which no party has timely objected, provided no clear error is apparent from the face of the record.  *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008).

The district court will also review the R&R for clear error where a party's objections are "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition."  *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted); *see also Nambiar v. Cent. Orthopedic Grp., LLP,* No. 24-1103, 2025 WL

3007285, at *4 (2d Cir. Oct. 28, 2025).  Moreover, "it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's [R&R] that could have been raised before the magistrate [judge] but were not." *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (quoting *Hubbard v. Kelley*, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009)).

### C.  Liberal Construction of *Pro Se* Petition

The Court holds submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers," *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (quoting *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)), and liberally construes their pleadings "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. New York State Department of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nonetheless, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)); *see also Zapolski v. Federal Republic of Germany*, 425 F. App'x 5, 6 (2d Cir. 2011) (*pro se* plaintiffs must plead sufficient facts to establish a plausible claim to relief and establish subject matter jurisdiction).

## III.  DISCUSSION

Encarnacion filed the Petition asking the Court to vacate his conviction on several grounds, while also arguing that his sentence is illegally excessive.  Doc. 1.  First, he argues that the DNA buccal swab taken from him violated his right to due process and right to counsel, and raises two related ineffective assistance of counsel claims.  *Id.* at 8, 117–234.  Second, Encarnacion argues that the trial court failed to charge the EED defense, and that his trial counsel's failure to renew his initial request for an EED jury

18

instructions constituted ineffective assistance. *Id.* at 238. Third, he argues that the government committed a *Brady* violation by failing to provide a DNA laboratory report on a timely basis and that his trial counsel was ineffective in failing to challenge the *Brady* violation at trial. *Id.* at 237. Fourth, Encarnacion alleges ineffective assistance based on (1) his trial counsel's failure to advise him regarding a plea offer of ten years; (2) his trial counsel's failure to move to suppress statements that he made to police; and (3) his appellate counsel's failure to raise several constitutional challenges to the conviction on appeal. *Id.* at 9–16, 235–238. Fifth, Encarnacion argues that the trial court violated his right to confrontation when it admitted Ophelia's grand jury testimony. *Id.* at 237–238. Lastly, he challenges his sentence as "illegally excessive." *Id.* at 238.

### A. The Claims Regarding the DNA Buccal Swab Claims Are Denied

Encarnacion argues that the DNA buccal swab violated his constitutional rights, including his right to due process and right to counsel. *Id.* at 8. Specifically, he argues that the trial court granted the government's motion to obtain his DNA sample without providing his counsel with notice and an opportunity to respond, which violated his right to due process and counsel. *Id.* at 129, 117–234.

Judge Aaron recommended denying these claims on both procedural and substantive grounds. Doc. 52 at 31–33.

#### 1. The Due Process and Right to Counsel Claims Are Procedurally Barred

Under the adequate and independent state ground doctrine, "the Supreme Court 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Davis v. Racette*, 99 F. Supp. 3d 379, 387 n.3 (E.D.N.Y. Apr. 21, 2015) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "In the context of federal habeas review, if a defendant's federal challenge was not addressed in state court because the defendant failed to meet a state procedural requirement, federal habeas review is barred." *Id.* (citing *Coleman*, 501 U.S. at 730). "A procedural rule is

19

considered adequate if it is 'firmly established and regularly followed by the state in question.'" *Davis v. Walsh*, No. 08-cv-04659 (PKC), 2015 WL 1809048, at \*9 (E.D.N.Y. Apr. 21, 2015) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)) (noting that "[t]o be independent, the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case").

"A habeas petitioner may bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To demonstrate actual innocence, a habeas petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In other words, in order to demonstrate actual innocence, a petitioner must make a stronger showing than is required to establish prejudice under an ineffective assistance claim. *Dunham*, 313 F.3d at 730 (noting that "if [the petitioner's] ineffectiveness claim lacks merit, the actual innocence exception relied on by the district court is necessarily foreclosed").

As previously noted, the Court reviews *de novo* those portions of the R&R to which timely and specific objections are made. 28 U.S.C. § 636(b)(1)(C); *see also Male Juvenile*, 121 F.3d at 38. However, when a party fails to make timely and specific objections to the R&R, the Court will only review for clear error. *Lewis*, 573 F. Supp. 2d at 811. Here, Encarnacion raises both procedural and substantive objections to the R&R's analysis. Doc. 56 at 1–4. Because those objections are timely and specific, the Court's review is *de novo*.

Judge Aaron concluded that Encarnacion's right to counsel and due process claims regarding the buccal swab were procedurally barred because they were denied under CPL § 440.10(2) and § 440.10(3)(c), which are independent and adequate state

procedural grounds which bar federal habeas review.  Doc. 52 at 31–33.  Encarnacion objects to this conclusion because he contends that New York courts "have long held that procedural bars do not apply to . . . actual denial of counsel during a critical stage" of the proceedings – which he contends was the case here.  Doc. 56 at 4.[11]

Reviewing *de novo*, the Court discerns no error.  Encarnacion was required to raise the right to counsel and due process claims on direct appeal or in subsequent post-appellate proceedings, but did not do so.  *See* N.Y. CPL §§ 440.10(2)(c), (3)(c).  As Judge Aaron found, both CPL § 440.10(2) and § 440.10(3)(c) are independent and adequate state procedural grounds which bar federal habeas review.  *See Sanabria v. Martuscello,* No. 15-cv-01534 (CS) (LMS), 2019 WL 4942118, at *9 (S.D.N.Y. Oct. 8, 2019) ("The cases in this Circuit hold that C.P.L. § 440.10(2) is an 'adequate and independent' state procedural ground barring federal habeas review."); *Waters v. Martuscello*, No. 10-cv-5700 (DLI), 2014 WL 1276957, at *8 (E.D.N. Y. Mar. 27, 2014) (finding a claim was procedurally barred, and noting that "[c]ourts have routinely recognized that a petitioner's failure to comply with [CPL § 440.10(3)(c)] in litigating a claim operates as an independent and adequate state law ground barring subsequent federal habeas review of such a claim").

---

[11] Encarnacion also contends that the R&R resolved his right to counsel and due process claims on the merits, Doc. 56 at 2, and, in doing so, incorrectly applied the *Strickland* test to his claims, *id.* at 1–4.  He argues that *Strickland* does not apply to his claims because he is not alleging ineffective assistance of counsel, but rather the "deni[al of] counsel at a critical stage of his trial," which, unlike ineffective assistance, does not require a showing of prejudice.  *United States v. Cronic*, 466 U.S. 648, 659 (1984).  In advancing this argument, however, Encarnacion misunderstands the R&R's reasoning.  Judge Aaron did apply the *Strickland* test, but only to Encarnacion's "claim that his trial counsel was ineffective for failing to challenge the prosecution's delay in requesting the DNA buccal swab," Doc. 52 at 33, which Judge Aaron distinguished from Encarnacion's "add[itional]" claim that the "trial court's decision granting the motion violated his right to counsel," *id.* at 31.  And rather than addressing the merits of Encarnacion's right to counsel and due process claims, Judge Aaron simply concluded that they were procedurally barred. *Id.*

In resisting this conclusion, Encarnacion highlights language from the R&R that "all of [Encarnacion's] claims should be dismissed on the merits."  Doc. 52 at 30 n. 27; Doc. 56 at 2.  In making this statement, however, Judge Aaron was merely clarifying that he need not address whether Encarnacion's claims were *time-barred* because they would otherwise fail for the reasons set forth in the R&R—which included Encarnacion's various procedural defaults.

Nor has Encarnacion met his burden to show that, under New York law, he was excused from this procedural bar because he claimed that he was denied the right to counsel regarding the DNA motion.  In support of this contention, Encarnacion cites to *People v. Grubstein*, 24 N.Y.3d 500 (2014).  In that case, the Court of Appeals did hold that a defendant was not "not barred from a raising [a claim that he was denied his right to counsel] in a motion under CPL [§] 440.10 by his failure to raise it on direct appeal." *Id.* at 501–02.  But the Court of Appeals did so because it concluded that "an interference with the right to counsel *that impaired the defendant's ability to pursue appellate relief* should normally be a sufficient justification" to fail to appeal or raise an issue on appeal under CPL § 440.10(2)(c).  *Id.* at 503 (emphasis added).  That was so, the Court of Appeals reasoned, because "the very deprivation [of counsel] may well have led [the defendant] either not to appeal or not to have presented the issue to an appellate court." *Id.* at 502–03.

Against this backdrop, the Court agrees that Encarnacion's right to counsel and due process claims are procedurally defaulted.  At bottom, Encarnacion does not explain why the deprivation of counsel that he alleges occurred here—a denial of his right to consult with counsel regarding the buccal swab motion—"impaired [his] ability to pursue appellate relief." *Id.* at 503.  Nor is it apparent that a deprivation of the kind that Encarnacion's alleges could have that effect under New York law, especially given the stark factual differences between the claim in *Grubstein* and the one Encarnacion advances here.  *See id.* at 502 (noting that defendant "was not represented by counsel" during the entire proceeding, "was not advised of his right to appeal, and took no appeal").  Therefore, the Court concludes that the state court's decisions were not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). Accordingly, Encarnacion's due process and right to counsel claims related to the DNA buccal swab are denied.[12]

### 2. *The Ineffective Assistance of Counsel Claims Are Denied*

The R&R understood Encarnacion to have raised two distinct ineffective assistance of counsel claims related to the DNA buccal swab. The Court will discuss each in turn.

#### a. *Trial Counsel*

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty, and sentencing." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citations omitted). To succeed on a claim of ineffective assistance of counsel, a claimant must satisfy the two-part test established by the Supreme Court in *Strickland*:

> Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he "must show that counsel's performance was deficient," so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (citations omitted) (quoting *Strickland*, 466 U.S. at 687, 690, 694).

Under the first prong of *Strickland*, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of

---

[12] In objecting to this section of the R&R, Encarnacion also claims that Judge Aaron "overlook[ed] and [did] not rul[e] on [his] claims of prosecutorial misconduct [and] official misconduct concerning the fraud of the false attorney, the false court order[,] the lack of a chain of custody for the DNA swabs[,] [and] the outright lack of any DNA reports[,] as these claims provided the full picture of how DNA evidence was il[l]egally obtained from [him] and used against [him] at trial two-weeks before [his] trial was set to start." Doc. 56 at 4-5. Encarnacion's Petition, however, only referenced these issues as arguments in support of his broader constitutional due process and right to counsel claims, Doc. 1 at 153-67, which the Court agrees are procedurally barred. Thus, Judge Aaron did not err in failing to explicitly respond to those allegations.

23

counsel's conduct." *Strickland*, 466 U.S. at 690. The Court "must make 'every effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 689).

Under the second prong of *Strickland*, the petitioner must establish prejudice. "To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). To satisfy reasonable probability, "the defendant must show more than that the unprofessional performance merely 'had some conceivable effect[;]' . . . however, 'a defendant *need not show* that counsel's deficient conduct more likely than not altered the outcome in the case.'" *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 693).

Judge Aaron treated the Petition as having raised an ineffective assistance claim based on trial counsel's failure to challenge the prosecution's delay in requesting the DNA buccal swab. Doc. 52 at 33. It is not clear from the Petition that Encarnacion did, in fact, advance this claim. Moreover, in his objections to the R&R, Encarnacion appears to affirmatively disclaim any reliance on such a claim, arguing instead that his claim is based on the theory that he was denied counsel during a critical stage of the proceedings against him. Doc. 56 at 1–4. Rather than count this apparent concession against Encarnacion, the Court assumes—favorably to Encarnacion—that the Petition does raise an ineffective assistance of counsel claim based on trial counsel's failure to challenge the prosecutorial delay in collecting the buccal swab. But because Encarnacion does not

24

raise any specific objections to this aspect of the R&R aside from his objection that the claim is not an ineffective assistance claim, the Court reviews for clear error.

Judge Aaron held that the state court's rejection of this ineffective assistance claim was not objectively unreasonable because, "[a]mong other deficiencies, [Encarnacion] has not demonstrated prejudice as a result of his counsel's failure to challenge the delay." Doc. 52 at 33.  Given the overwhelming evidence of petitioner's guilt at trial, this conclusion is not clearly erroneous. *See Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991).  Thus, to the extent that the Petition asserts an ineffective assistance claim based on trial counsel's failure to challenge the prosecution's delay in requesting the DNA swab, this claim is denied.

### b.  *Appellate Counsel*

Encarnacion also asserts that his appellate counsel was ineffective when he failed to raise the following on appeal:  (1) that he was deprived of his right to counsel in connection the DNA buccal swab request; and (2) that his due process rights were violated in the collection of his DNA.  Doc. 1 at 236.  Judge Aaron found that because the underlying claims lacked merit, the Appellate Division's denial of the ineffective assistance of appellate counsel claim was not objectively unreasonable.  Doc. 52 at 41.

Encarnacion argues that his "appellate counsel was objectively unreasonable for not raising the due process and right to counsel claims" because these claims would have been successful.  Doc. 56 at 7.  In support of this contention, he cites to the *People v. Smith*, 30 N.Y.3d 626 (2017), in which the New York Court of Appeals held that, "[o]n the[] facts, . . . '[t]he pretrial proceedings concerning [a] DNA test were 'critical' within the meaning of" the Sixth Amendment and its state constitutional counterpart.  30 N.Y.3d 626, 629 (2017); *see* Doc. 56 at 7.  In response, the government argues that Encarnacion's appellate counsel cannot be deemed ineffective for failing to raise meritless arguments.  Doc. 63 at 7–8 (citing *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)).

25

Reviewing *de novo*, the Court discerns no error in the R&R's ruling. As Judge Aaron noted, the state court found that the underlying due process and right to counsel claims lacked merit. Doc. 52 at 41, 31. The state court did so, in part, because it found that Encarnacion's "trial attorney was likely aware of the People's intention to seek a buccal swab for DNA testing about three weeks before the People filed their October 2007 DNA motion because they had first sought an order compelling the defendant to provide a DNA sample on September 18, 2007 during the suppression hearing." Doc. 42-34 at 5; Doc. 52 at 31. And it based this finding on evidence in the record, namely the trial transcript, an affirmation from Encarnacion's counsel for his 2013 CPL § 440.10 motion, and the affidavit of service from the government's DNA motion. Doc. 42-34 at 5. In his objections, Encarnacion does not meaningfully contend with this apparent finding; he merely directs the Court's attention to a 2018 affidavit from his trial counsel stating that he did not recall whether he received notice of the DNA motion and was not familiar with another attorney who was also listed on the affidavit of service. Doc. 56 at 7; Doc. 47 at 199–200. Without more, the Court cannot say that appellate counsel was ineffective in failing to raise the due process and right to counsel claims.

Nor does *People v. Smith* support the weight that Encarnacion seeks to place on it. As an initial matter, because *Smith* did not involve a due process claim, it cannot bear on whether Encarnacion's appellate counsel was deficient failing to raise such a challenge. And though *Smith* did hold that the defendant in that case was deprived of his Sixth Amendment right to counsel, in doing so, the Court of Appeals emphasized that its decision was "narrow" and based only on the "facts before" it. 30 N.Y.3d at 630. Indeed, the Court described its holding as follows:

> Where the court grants counsel's motion to be relieved from the case in defendant's absence but orders the taking of a DNA sample based on that counsel's inaction, and defendant at the first opportunity denies consent and requests assistance of counsel on that motion, the court may not deny the request

and inform an unrepresented defendant that, in the court's opinion, there is no legal recourse.

*Id.* Encarnacion does not explain how the facts of his case—which bear little resemblance to the fact pattern in *Smith*—fall within *Smith*'s "narrow" ambit. *Id.* Nor, importantly, does Encarnacion engage with the fact that *Smith* was not decided until nearly a decade after his appellate counsel had filed his briefs—or point to any caselaw from that time that suggests that his right to counsel claim was "significant and obvious." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *see also id.* ("Counsel is not required to forecast changes in the governing law."). Therefore, Encarnacion's ineffective assistance claim based on his appellate counsel's failure to raise issues related the DNA buccal swab on appeal is denied.

### B. The Claims Regarding the EED Jury Charge Are Denied

Encarnacion argued in his Petition that the trial court erred when it failed to charge the affirmative defense of EED, and that his trial counsel was ineffective for failing to renew his request for an EED charge. Doc. 1 at 238. Encarnacion did not object this aspect of the R&R, and its analysis on this score is not clearly erroneous.

On direct appeal, the Appellate Division denied the failure to charge the jury claim on both procedural and substantive bases. *Encarnacion*, 87 A.D.3d at 92. First, the court noted that this issue was "abandoned and unpreserved" because "counsel never objected to the trial court's failure to submit this instruction to the jury." *Id.* Second, the court also dismissed this argument because it lacked merit. *Id.* The court also denied the ineffective assistance of counsel claim because "it cannot be determined on the existing record whether counsel's abandonment of the issue was an oversight or a deliberate strategic choice" and Encarnacion "ha[d] not 'demonstrate[d] the absence of strategic or other legitimate explanations' for counsel's actions.'" *Id.* (quoting *People v. Rivera*, 71 N.Y.2d 705, 709 (1988)). The court finally noted that, "[i]n any event, an extreme emotional disturbance charge was unwarranted." *Id.*

27

Encarnacion also raised this issue in his October 2013 § 440.10 motion.  Doc. 42-7 at 16.  The Bronx Supreme Court denied the claim pursuant to CPL § 440.10(2)(a) reasoning that Encarnacion had failed to supplement the record with evidence demonstrating that his counsel's abandonment of the EED charge was accidental, rather than strategic.  Doc. 41-10 at 4.

Judge Aaron recommended that the failure to charge the jury claim be denied because "federal courts will 'not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Doc. 52 at 45–46 (quoting *Coleman*, 501 U.S. at 729).  Judge Aaron also recommended that the ineffective assistance claim be denied because the Appellate Division's denial was not objectively unreasonable since Encarnacion has not established that the abandonment of the EED defense was not a strategic choice.  *Id.* at 47–48.

Here, while Encarnacion's trial counsel did request that Justice Foley charge the jury with EED, Justice Foley did not include it in the final charge.  Doc. 43-10 at 32.  But before reading the final charge, Justice Foley asked Encarnacion's trial counsel if he had read it, and he indicated that he had but did not raise any further objection or request.  *Id.* at 90.  As Judge Aaron noted, the Appellate Division ruled the issue unpreserved when counsel did not renew his request; in this Circuit, we have held this as an adequate state law ground that is independent of the federal question.  Doc. 52 at 46 (citing *Jefferies v. Sheahan*, No. 15-cv-02890 (PKC) (SN), 2016 WL 3660767, at \*7 (S.D.N.Y. Mar. 10, 2016) (concluding that the petitioner's claim was procedurally barred "because the Appellate Division denied it as unpreserved or waived"), *report and recommendation adopted*, 2016 WL 3661546 (S.D.N.Y. July 5, 2016)).

Similarly, Encarnacion has not demonstrated that his counsel did not abandon the EED defense for strategic purposes.  Doc. 52 at 47.  The Bronx Supreme Court specifically noted that Encarnacion failed to "supplement the record" to discern whether

28

his trial counsel deliberately abandoned the EED issue, or whether it was an oversight. Doc. 42-10 at 4. And, as the Appellate Division noted, "placing [Encarnacion's] mental condition in issue would have opened the door to very damaging evidence, namely that [he] feigned mental illness when he was previously examined under CPL article 730." *Encarnacion*, 87 A.D.3d at 92*; see* Doc. 42-40 at 8–11. Thus, Encarnacion's trial counsel could have strategically chosen not to renew his EED objection because doing so may have been damaging to Encarnacion in light of those findings. *See Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (noting that a "lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision"). As such, Encarnacion has not met the *Strickland* test, as he has neither shown that his trial counsel's decision was "deficient" nor that he was "prejudiced" when Justice Foley did not charge the jury on the EED defense. *Strickland*, 466 U.S. at 687, 690, 694. Accordingly, this ineffective assistance of counsel claim is denied.

### C. The *Brady* Claims Are Denied

Encarnacion further challenges his conviction on the grounds that the government committed a *Brady* violation by failing to provide DNA laboratory reports to his counsel. Doc. 1 at 237. In the same vein, he claims that his trial counsel provided ineffective assistance by not challenging the government's alleged *Brady* violation. *Id.*

The Bronx Supreme Court rejected these claims in its decisions on Encarnacion's December 2015 and August 2018 § 440.10 motions. *See* Doc. 42-16 at 3–4; Doc. 42-34 at 3. In denying the December 2015 motion, the Bronx Supreme Court concluded that the claims were procedurally barred under §§ 440.10(2)(c) and (3)(c) because they were either "record-based" and "could have and should have been raised on direct appeal" or not record-based but "could have and should have been asserted in either of [Encarnacion's] subsequent post-appellate proceedings." Doc. 42-16 at 5. Because Encarnacion "conspicuously fail[ed] to proffer any reason or explanation [for] why" he

29

did not raise these issues on direct appeal or post-appellate proceedings, the Bronx Supreme Court concluded that his failure to do made it "patently obvious" that the claims were procedurally barred. *Id.*

In denying the December 2015 motion, the Bronx Supreme Court also held that Encarnacion's ineffective assistance claims failed under § 440.30(4)(d), which grants courts the authority to deny a motion to vacate without a hearing when an allegation is unsupported by the record or unsubstantiated by anyone other than the defendant, and when there is no reasonable possibility that such allegations can be true. *See* N.Y. CPL § 440.30(4)(d); *see also* Doc. 42-16 at 6-7. The Bronx Supreme Court further concluded that even if it considered the ineffective assistance claims, it would deny them because Encarnacion had failed to show that he was prejudiced by his counsel's conduct. Doc. 42–16 at 7-8, 11-12.

In denying Encarnacion's August 2018 motion, the Bronx Supreme Court again relied on § 440.10(2)(c). It held that the *Brady* claim was procedurally barred under that provision because "whether defense counsel possessed the [DNA] laboratory report . . . can . . . be found in the parties' filings and on the face of the trial testimony"— and that it followed that the claim was "record-based." Doc. 42-34 at 3. The court further concluded that, in any event, the claim was meritless because Encarnacion's "trial counsel referred to specific portions of the OCME DNA laboratory report when cross examining the criminalist at trial, and thus clearly possessed the report." *Id.* at 5.

Judge Aaron recommended that both claims be denied procedurally and on the merits, because Encarnacion failed to raise these claims in his direct appeal and the Bronx Supreme Court's decisions were not an unreasonable application of *Brady* or *Strickland*. Doc. 52 at 42–43.

The due process clauses of the federal and New York constitutions both guarantee a criminal defendant the right to discover favorable evidence in the prosecution's possession material to guilt or punishment. See *People v. Fuentes*, 12 N.Y.3d 259, 263–

30

64 (2009) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).  "To establish a *Brady* violation, a defendant must show that (1) the evidence is favorable to him because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material."  *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999)).

Encarnacion objects to Judge Aaron's recommendation regarding his substantive *Brady* claim both procedurally and on the merits.  Doc. 56 at 6, 8.  Encarnacion contends that the claim was not procedurally defaulted because it was based not on the record, but rather an "affirmation from Bronx A.D.A. Shera Knight dated 1/3/18 in where after years of misleading statements . . . it was finally admitted that 'here, the prosecution *did not have* possession of the DNA reports' . . . ."  *Id.* at 6.  Encarnacion also objects on the merits to Judge Aaron's reliance on the state court's finding that his "trial counsel referred to specific portions of the DNA report when cross-examining the People's criminalist expert at trial and thus clearly possessed the report."  Doc. 52 at 42.  He argues that there were two DNA reports that were relevant to his trial:  a 2005 report that was not based on his buccal swab and a 2007 report that was.  Doc. 56 at 8.  And he contends that the "only evidence we have concerning the 2007 DNA reports is the 1/3/18 affirmation by A.D.A. Knight" and "one line in the transcripts where trial counsel asks the expert one question [by] stating 'I see in your report dated September 29, 2005,'" which, in his view, is "not proof" of the "existence of the DNA 2007 reports or that a test was even done."  *Id.*

In response, the government argues that Encarnacion's claims, aside from being procedurally barred, are also meritless because Encarnacion's trial counsel did, in fact, possess "the DNA report."  Doc. 62 at 9.  The government contends that the Bronx Supreme Court found that "[Encarnacion's] trial counsel competently cross-examined the criminalist while quoting the DNA lab report," and thus "that the DNA report had been provided to [Encarnacion's] counsel in time for counsel to use it effectively at trial."  Doc. 62 at 9–10; *see* Doc. 42-16 at 3–4, 5.  And because, in the government's view,

Encarnacion has not provided clear and convincing evidence to refute that factual finding, the government contends that the Court cannot disturb it. Doc. 62 at 10 (citing 28 U.S.C. § 2254(e)(1)). The government further argues that, in any event, Encarnacion has not established a *Brady* violation "because he has not shown that anything in the allegedly undisclosed report was 'exculpatory,'" and that, to the contrary, the DNA report was actually "inculpatory [in that] it showed that [Encarnacion's] DNA matched items found at the crime scene." *Id.*

Reviewing *de novo*, the Court agrees with Judge Aaron's recommendation. Encarnacion's substantive *Brady* claim was record-based; as the state court noted, the basis of the *Brady* claim—that is, whether his counsel possessed the 2007 DNA report— was ascertainable from the filings and trial transcript. *See* Doc. 52 at 41–42. Indeed, it is presumably for that reason that Encarnacion raised the *Brady* claim in his December 2015 motion, which he filed prior to receiving Knight's 2018 affirmation. *Id.* at 41; Doc. 42-11 at 10-19. So, the Court cannot see how that affirmation undermines the state court's conclusion that the claim was record-based and thus should have been raised on direct appeal. The Court therefore agrees with Judge Aaron that the claim was procedurally defaulted.

Moreover, even if the Court were to proceed to the merits, the *Brady* claim would nonetheless fail. As the government correctly notes, Encarnacion has not rebutted the state court's finding that his trial counsel possessed the 2007 DNA report by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The only evidence that Encarnacion offers against that finding is his trial counsel's explicit reference to the 2005 DNA report at trial and Knight's affirmation. Doc. 56 at 8. But the fact that his trial counsel specified that he was referring to a particularly dated report suggests that he was aware of more than one, particularly given the DNA expert's request that trial counsel clarify to "[w]hich report date" he was referring. Doc. 43-9 at 120. The state court's finding that Encarnacion's trial counsel possessed both DNA reports is further supported by trial

32

counsel's focus on the administration of two separate DNA tests—and the two-year delay between them—during cross-examination:

> Q.  Now, when did you prepare the initial examination of the samples that you have, you remember when you did those comparison tests?
> . . .
> A.  Examination of the evidence was started on March 24, 2005.
> . . .
> Q.  I see.  And when did you receive the samples of DNA allegedly from Encarnacion, the defendant?
> A.  Those—those swabs were received on October 11, 2007.
> Q.  This year?
> A.  Yes, that's correct.
> Q.  A few weeks ago.  Now, so, did you perform the test on Torres's DNA prior to receiving Mr. Encarnacion's DNA; is that correct?
> A.  Yes, that's correct.
> . . .
> Q.  And did you go through the same testing once you received Mr. Encarnacion's DNA?
> A.  It's a slightly different test simply because we're dealing with two different samples.

Doc. 43-9 at 117–18.

Against this contemporaneous backdrop, Knight's contrary affirmation—made nearly a decade after trial—does not clearly and convincingly rebut the state court's finding that Encarnacion's trial counsel possessed the 2007 DNA report.  Thus, even if Encarnacion's *Brady* claim were procedurally viable, it would fail on the merits.  *See United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993))).  It follows that Encarnacion also fails to prove that his trial counsel was ineffective for failing to raise a meritless *Brady* violation.  *See Aparicio v. Artuz*, 269 F.3d 78, 92–93 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which [p]etitioner was

entitled." (quoting *Jameson v. Coughlin*, 22 F.3d 427, 429–30 (2d Cir. 1994))).

Accordingly, Encarnacion's *Brady* claims are denied.

### D. Other Ineffective Assistance of Counsel Claims Are Denied

#### 1. Plea Offer

The Second Circuit has made clear that "failure to give any advice concerning acceptance of [a] plea bargain [is] below the standard of reasonable representation." *Cullen v. United States*, 194 F.3d 401, 404 (2d. Cir. 1999). "An attorney's failure to communicate a plea offer to his client, or to advise his client adequately about the plea offer, may [also] constitute constitutionally deficient assistance." *Abraham v. Lee*, No. 13-cv-2525 (RWS), 2014 WL 3630876, at *9 (S.D.N.Y. July 22, 2014) (citing *Cullen*, 194 F.3d at 404). Thus, to prevail on an on ineffective assistance of counsel claim in the plea-bargain context, a defendant "must show not only a reasonable probability that he would have accepted the lapsed plea but also a reasonable probability that the prosecution would have adhered to the agreement and that it would have been accepted by the trial court." *Missouri v. Frye*, 566 U.S. 134, 150 (2012).

In his Petition, Encarnacion challenged his conviction on the ground that his trial counsel was ineffective when he failed to adequately advise him regarding the ten-year plea offer. Doc. 1 at 235. However, Encarnacion's trial counsel submitted an affidavit stating that shortly before or very early in the trial, the government conveyed a plea offering a ten-year sentence, but that Encarnacion chose to turn it down. *See* Doc. 42-7 at 31–32. In its decision denying the October 2013 § 440.10 motion, the Bronx Supreme Court denied Encarnacion's ineffective assistance claim, concluding that "[i]n light of the fact that the [Encarnacion's] former trial counsel avers that the [government] did offer a ten year plea bargain and that he discussed the offer with [Encarnacion], [Encarnacion's] argument on this ground is supported solely by [him] and there is no reasonable possibility that it is true." Doc. 42-10 at 3–4. Furthermore, the Bronx Supreme Court

highlighted that the government denied ever offering Encarnacion a ten-year plea offer. *See* Doc. 42-19 at 4 n.1.

Judge Aaron recommended finding no ineffective assistance because Encarnacion bears the burden of rebutting by clear and convincing evidence the presumption that the Bronx Supreme Court's factual findings were correct and failed to do so. Doc. 52 at 34; *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Specifically, Judge Aaron found that there has been no showing that his trial counsel did not advise him regarding the alleged plea offer. *Id.* at 34–35. In addition, Judge Aaron found that the Bronx Supreme Court did not unreasonably apply *Strickland*. *Id.* at 35.

Encarnacion does not object to the R&R on this ground, so the Court reviews for clear error. The Court agrees with Judge Aaron's findings. As the Bronx Supreme Court noted, the only evidence advanced in support of this argument is Encarnacion's own assertion that his trial counsel "[d]uring the trial . . . advised [him] that the District Attorney's Office had offered [him] a plea with a sentence of ten years . . . while [sitting] at counsel table during the trial . . . . but . . . never gave [him] any advice whatsoever concerning the advisability of accepting the offer." Doc. 42-10 at 3. On the contrary, Encarnacion's own trial counsel rebutted this assertion when he attested that he "discussed the matter with [Encarnacion], who made a decision to reject the offer." Doc. 42-7 at 32. Moreover, the government denied that they ever made such an offer. Doc. 42-10 at 4 n.1. Thus, on this evidence alone, Encarnacion has failed to meet his burden that he would have accepted the plea and that the government would have adhered to the agreement. *Frye*, 566 U.S. at 150 (2012).

35

As the Second Circuit held, reasonable professional conduct does not under all circumstances require counsel to give an explicit opinion as to whether a defendant should take a plea offer. *Purdy v. United States*, 208 F.3d 41, 48 (2d Cir. 2000). Here, Encarnacion conceded that he was told about the offer, and even if he never explicitly rejected it, Encarnacion fails to show that he would have accepted the offer. For example, he does not argue that he communicated with his attorney about the offer at any point after he was told about it. Accordingly, Encarnacion's right to the effective assistance of counsel during the plea stage was not violated, and this claim is denied.

### 2. *Failure to Suppress Statements Made to Police*

Encarnacion claims that his trial counsel was ineffective when, despite seeking a *Dunaway* hearing, failed to obtain one because "he failed to appraise the [c]ourt with sufficient facts which were available to warrant the hearing and subsequent suppression." Doc. 1 at 235. Encarnacion raised this claim in the October 2013 § 440.10 motion. *See* Doc. 42-7 at 16, 19.

*Dunaway v. New York* addressed the "legality of custodial questioning on less than probable cause for a full-fledged arrest." 442 U.S. 200, 202 (1979) (quoting *Morales v. New York*, 396 U.S. 102, 106 (1969)). Thus, "a *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial." *Berry v. Hulihan*, No. 08-cv-6557 (LBS), 2009 WL 233981, at *7 (S.D.N.Y. Jan. 28, 2009). In the context of an alleged failure to request a *Dunaway* hearing, *Strickland* requires that a defendant show that: "(1) a competent attorney would have made the motion; (2) the suppression motion would have been successful; and (3) the outcome of the proceeding would have been different absent the excludable evidence." *See Watson v. Crowley*, No. 07-cv-01111 (RJS) (RLE), 2011 WL 4639814, at *4 (S.D.N.Y. May 10, 2011), *report and recommendation adopted sub nom. Watson v. New York*, 2011 WL 4639812 (S.D.N.Y. Oct. 6, 2011). At a minimum, a petitioner must show that he could have prevailed on a

suppression motion to satisfy the prejudice prong of the *Strickland* test.  *See McClary v. Conway*, 492 F. App'x 157, 159 (2d Cir. 2012).

The Bronx Supreme Court denied his claim because:  (1) there was "no evidence" that, at the time of the *Dunaway* motion, his trial counsel was aware of Encarnacion's allegation that he was a "virtual prisoner," in that "a police officer [was] with [him] at all times, told [him that he] could not leave, and then transported [him] to a police station without asking [him] if [he] was willing to go there"; and (2) "there [were] no factual allegations that would establish that, had a *Dunaway* hearing been held, it would have resulted in the suppression of" Encarnacion's statements.  Doc. 42-10 at 4–5.

Judge Aaron held that the Bronx Supreme Court's decision was not objectively unreasonable.  Doc. 52 at 36–37.  Judge Aaron specifically found that the state court's conclusion that Encarnacion's counsel was not deficient was reasonable because there was no evidence that counsel was aware of the facts that Encarnacion alleges would have supported the motion.  *Id*. at 36.  Judge Aaron also concluded that the state court's determination that motion would not have been successful was reasonable, based on Encarnacion's failure to address "when [his] bloody clothing was recovered, which may have given rise to probable cause" or "whether or not [his] statement to the police was attenuated from the allegedly illegal arrest."  *Id.* at 36–37 (quoting Doc. 42-10 at 5).  Finally, Judge Aaron also noted that, even if the suppression motion would have succeeded, the outcome of the proceedings would not have differed given the overwhelming evidence of Encarnacion's guilt.  *Id.* at 37.

Encarnacion does not raise any specific objection to this aspect of the R&R, and Judge Aaron's decision on this score is not clearly erroneous.   The Court agrees with Judge Aaron that the Bronx Supreme Court's application the *Strickland* test was not objectively unreasonable.

At bottom, Encarnacion has not shown that the state court's conclusion that his counsel's performance was not deficient is objectively unreasonable.  As Judge Aaron

noted, the Bronx Supreme Court based that conclusion on its finding that Encarnacion presented "*no evidence* that trial counsel was aware of the[] facts" that Encarnacion alleges made his detention illegal "*at the time the* [*Dunaway*] *motion was made*." Doc. 42-10 at 5 (emphasis added). In his Petition, Encarnacion did not dispute this finding; he argued only that, as a matter of logic, his trial counsel must have been "aware, prior to making the motion[,] that there was evidence that [his] statements were the product of an il[l]egal arrest" because counsel "made the motion to obtain the *Dunaway* hearing in the first place." Doc. 47 at 35 (emphasis omitted). But Encarnacion bears the burden of establishing that he is entitled to relief. *Machado v. Commanding Officer, Plattsburgh Air Force Base*, 860 F.2d 542, 544 (2d Cir. 1988). And because Encarnacion provided no evidence that his trial counsel was, in fact, aware of any specific allegations that would have supported the motion prior to making it, the state court's rejection of his ineffective assistance claim on this basis was not objectively unreasonable. Moreover, the Court agrees with Judge Aaron that Encarnacion has not shown that "the outcome of the proceeding would have been different absent the excludable evidence." *Watson*, 2011 WL 4639814, at *4. Accordingly, Encarnacion's ineffective assistance claim based on the *Dunaway* hearing is denied.

### 3. Appellate Counsel

Encarnacion's Petition further argued that his appellate counsel provided ineffective assistance of counsel by failing to raise three issues on appeal: (1) a violation of his Fifth Amendment right against self-incrimination; (2) a violation of his Sixth Amendment right to confront the witnesses against him; and (3) violations of his right to counsel and due process related to the collection of his DNA. Doc. 1 at 236. Judge Aaron found that Encarnacion did not meet the *Strickland* test for any of his claims and thus recommended that this Court deny these three claims. *See* Doc. 52 at 37–41. Encarnacion does not object to Judge Aaron's analysis regarding the first two claims, and

38

so the Court reviews for clear error. The Court agrees with Judge Aaron's recommendation and explains each in turn.[13]

      *a.  Fifth Amendment*

Encarnacion argues that his appellate counsel provided him ineffective assistance when counsel failed, on appeal, to argue that his statements to the police were obtained in violation of his Fifth Amendment right against self-incrimination. Doc. 1 at 236. Judge Aaron found that the Appellate Division was not objectively unreasonable in denying this claim, which was raised in his 2012 *coram nobis* motion. Doc. 52 at 38.

The Supreme Court has cautioned that appellate counsel is not required to raise every claim but instead the best arguments, based on counsel's reasonable professional judgments. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") To meet the prejudice factor on appeal, there is a "'strong presumption of reliability' to judicial proceedings," and a defendant is required to overcome that presumption. *Id.* at 286.[14]

The Supreme Court has described the *Miranda* warnings as a "prophylactic rule," and as a "procedural safeguard," to protect Fifth Amendment rights against "the compulsion inherent in custodial surroundings." *Brown v. Illinois*, 422 U.S. 590, 600 (1975). The function of the *Miranda* warnings relates to the Fifth Amendment's guarantee against coerced self-incrimination and serves to deter the taking of an incriminating statement without first informing the individual of his rights. *Id.*

---

[13] The Court already discussed issues related to the collection of his DNA and will not discuss them further here.

[14] There are three categories of cases, described in *Strickland*, in which the courts presume prejudice rather than require a defendant to demonstrate it. *Strickland*, 466 U.S. at 696. First, in a case of denial of counsel; second, "various kinds of state interference with counsel's assistance;" and third, "when counsel is burdened by an actual conflict of interest." *Robbins*, 528 U.S. at 287.

Here, Encarnacion fails to meet either *Strickland* prong. As Judge Aaron noted, the record reflects that Encarnacion waived his *Miranda* rights before he made the statements to the police. Doc. 52 at 38–39; *see* Doc. 43-1 at 16–17, 25–29, 34. Thus, his counsel was not required to raise such a claim. *Barne*s, 463 U.S. at 754. Nor does Encarnacion meet the second factor, as he has not put forth any arguments regarding how he was prejudiced, especially in light of the overwhelming evidence against him, to overcome the strong presumption of reliability required. *Robbins*, 528 U.S. at 286. Therefore, the Court agrees that the Appellate Division's denial of this claim was not objectively unreasonable.

### 4. Sixth Amendment

Encarnacion also argues that his appellate counsel was ineffective because on appeal he failed to raise the violation of his Sixth Amendment right to confrontation when Ophelia's statement to Dr. Teperman was admitted under the excited utterance exception. Doc. 1 at 236, 249. Encarnacion raised this claim in his 2012 motion for a writ of *coram nobis*, Doc. 42-5 at 4–10, which the Appellate Division denied, *People v. Encarnacion*, 2012 WL 6699911 (N.Y. App. Div. Dec. 27, 2012). Judge Aaron concluded that Appellate Division's denial was not objectively unreasonable. Doc. 52 at 39.

In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause prevents the admission of evidence based on hearsay exceptions that are "invoked to admit testimonial statements against the accused in a criminal case." 541 U.S. 36, 56 (2005) (emphasis omitted). However, the Supreme Court limited the scope only to testimonial statements. *Davis v. Washington*, 547 U.S. 813, 823–24 (2006). In line with that opinion, the Second Circuit has ruled that "the Confrontation Clause simply has no application to nontestimonial statements." *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006). A statement is testimonial if "the circumstances objectively indicate that there [wa]s no . . . ongoing emergency, and that the primary purpose of the interrogation [wa]s

40

to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

Here, Ophelia's statement to Dr. Teperman, which was given while she was being medically treated for her stab wounds, was not in response to an interrogation to establish criminal prosecution, and thus was non-testimonial. *Id.*; *see* Doc. 52 at 5. As such, Judge Aaron's conclusion that the Appellate Division's decision was not objectively unreasonable is not clearly erroneous. *See United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance."). Accordingly, Encarnacion's Sixth Amendment claim is denied.

### E. The Claim Regarding the Admission of Ophelia's Grand Jury Testimony Is Denied

In his Petition, Encarnacion also argues that the trial violated his right to confrontation when it admitted Ophelia's grand jury testimony, because the government failed to meet its burden" that he induced her absence from trial. Doc. 1 at 237. After Encarnacion raised this claim in his direct appeal, the Appellate Division held that "the evidence clearly and convincingly established that [Ophelia's] refusal to testify was the product of fear, precipitated by [Encarnacion's] threats" and that, "to the extent that [his] misconduct procured [Ophelia's] refusal to testify, he forfeited his right to confront her." *Encarnacion*, 87 A.D.3d at 88. Judge Aaron concluded that the Appellate Division's decision was neither "'contrary to' nor an 'unreasonable application of' clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented." Doc. 52 at 44 (citing 28 U.S.C. § 2254(d)). In doing so, Judge Aaron relied on the Supreme Court's instruction that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, . . . 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.'" *Id.* (quoting *Davis*, 547 U.S. at 833).

As previously discussed, "[a] *Sirois* hearing is a type of evidentiary hearing held during New York state criminal proceedings to determine whether the accused procured a witness' unavailability—either literal unavailability or refusal to testify—through misconduct." *Drummond v. Cunningham*, No. 08-cv-04290 (KAM) (RLM), 2010 WL 5583116, at *2 n.5 (E.D.N.Y. Dec. 13, 2020). New York law requires the prosecution to show, by clear and convincing evidence, that the defendant was responsible for the witness's unavailability. *See Brown v. Smith*, No. 06-cv-1429 (PKC), 2008 WL 4922014, at *9 (S.D.N.Y. Nov. 12, 2008) (noting that the prosecution bears the burden at a *Sirois* hearing of "present[ing] clear and convincing evidence that the defendant's misconduct caused the witness's refusal to testify").

Here, the trial court, after hearing testimony from Ophelia's mother and Detective Martin, found by clear and convincing evidence that Encarnacion's repeated threats and other statements made to Ophelia over many months resulted in her refusal to testify. Doc. 42-40 at 43–44. Indeed, the trial court found that Encarnacion, who consistently called Ophelia's home, "exercise[d] great control over" Ophelia and that Ophela "had no intention of testifying against [Encarnacion] because of his influence on her." *Id.* at 44. Thus, Encarnacion both had the opportunity to intimidate Ophelia and actively took steps to do so. *See Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010) (finding that the defendant did not intimidate the witness since the prosecution did not prove that he "took any steps to orchestrate the intimidation . . . [nor did they] demonstrate that [the defendant] had the opportunity to do so"). Based on the record, the Appellate Division also found by clear and convincing evidence that Encarnacion, through misconduct, induced Ophelia's refusal to testify. *Encarnacion*, 87 A.D.3d at 87–89. The Court agrees that the Appellate Division's decision was neither "contrary" to nor an "unreasonable application" of clearly established federal law. *See Turner v. Graham*, No. 18-cv-492 (JPC), 2021 WL 1026384, at *10–12 (S.D.N.Y. Mar. 17, 2021). Thus, Encarnacion's claim that the trial court erred in allowing Ophelia's grand jury testimony is denied.

### F. The Excessive Sentence Claim Is Denied

Lastly, Encarnacion argues that his trial court's sentence is "illegal" because the sentences "should have [run] concurrent[ly] when the [government] failed to produce any evidence at trial to prove the alleged acts were [separate and distinct,] as required to warrant consecutive sentences." Doc. 1 at 238.

On direct appeal, the Appellate Division rejected his argument, concluding that there was "no basis for reducing [Encarnacion's] sentence." *See Encarnacion*, 87 A.D.3d at 92. Judge Aaron recommended denying the claim since the issue of whether a sentence should run concurrently or consecutively is purely a question of state law and is not cognizable under federal habeas law. Doc. 52 at 48. Because Encarnacion did not raise any specific objections to this recommendation, the Court reviews for clear error.

It is well established that "[w]hether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review." *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012); *see also Heath v. Hoke*, No. 88-cv-770E, 1989 WL 153759, at *3 (W.D.N.Y. Dec. 7, 1989) ("[A] state court's interpretation of state law on concurrent and consecutive sentences is not a question of federal constitutional dimension cognizable in a federal habeas corpus proceeding."). Thus, Encarnacion's claim is not amenable to adjudication here, and his excessive sentence claim is denied.

## IV.    CONCLUSION

For the reasons set forth above, the Court adopts the R&R, and the Petition is DENIED.

As Encarnacion has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Matthews v. United States*, 682 F.3d 180, 185 (2d Cir. 2012). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and

therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

        The Clerk of Court is respectfully directed to close this case, and mail a copy of this order to Encarnacion.

It is SO ORDERED.

Dated:    December 16, 2025
          New York, New York

                                      EDGARDO RAMOS, U.S.D.J.